# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**vs.**

**JORGE LUIS NOBREGA RODRIGUEZ,**

      **Defendant,**

_____/

**CASE NO.:** 1:21-CR-20442
**JUDGE:** PAUL C. HUCK

## DEFENDANT, JORGE NOBREGA'S RESPONSE TO THE PRESENTENCE INVESTIGATION REPORT AND REQUEST FOR A BELOW-GUIDELINE SENTENCE AND RDAP

The defendant, JORGE LUIS NOBREGA RODRIGUEZ (hereinafter "Mr. Nobrega"), by and through his undersigned counsel, and pursuant to U.S.S.G. § 6A1.2-3, p.s., Fed. R. Crim. P. 32 (d), (e)(2) and (f), and the Fifth Amendment to the United States Constitution, respectfully registers his Response to the Presentence Investigation Report (PSR) and Request for a Below-Guideline Sentence and RDAP and, as grounds therefore, states as follows:

## INTRODUCTION

On March 8, 2022, Mr. Nobrega pled guilty to a conspiracy to violate the International Emergency Economic Powers Act, in violation of 50 USC §§ 1701-1706 and 18 USC § 371. Mr. Nobrega, a 57-year-old naturalized United States citizen from Venezuela, has owned and

1

operated the businesses referenced in the instant offense since 1992. According to his indictment, the offense conduct started in January 2019 and ended upon his arrest on August 15, 2021. With the exception of a 1998 traffic offense, he has no prior criminal history. Historically, Mr. Nobrega has been an exemplary father, son, and brother. He provides both emotional and financial support for his four children, as well as other family members. This role as protector was shattered when he was arrested in this case in front of his two minor daughters at the Miami International Airport. He has remained incarcerated ever since.

Mr. Nobrega expeditiously and unequivocally accepted responsibility for his involvement in the offense and he is cooperating with the Government. He signed a written Plea Agreement and plead guilty just six months after his arrest. Pursuant to paragraph 13 of the Plea Agreement, he has agreed to a forfeiture money judgement in the amount of $3,743,337.93.

The parties have agreed that §§ 2X1.1 and 2M5.2 of the Sentencing Guidelines apply in this case and after a 3-level reduction for Mr. Nobrega's acceptance of responsibility, his *advisory* guideline range is 57 to 60 months, pursuant to § 5G1.(c)(1). The PSR reflects these calculations and there are no objections. However, there is an objection to the PSR suggesting there are no factors that may warrant a departure and/or variance in this case. The objections are briefed and submitted to this Court in a separate filing. Additionally, this filing will present sentencing factors, pursuant to 18 USC § 3553, to support a sentence below the *advisory* guideline range.

## OBJECTIONS TO PSR

There are no objections to either the Offense Conduct or Guideline sections of the PSR. However, as mentioned, there is a separate defense filing objecting to the omission of applicable discretionary basis that may warrant a departure and/or variance in this case. Any corrections/clarifications to non-sentencing issues in the PSR have been communicated directly with the probation officer.

## REQUEST FOR A BELOW-GUIDELINE SENTENCE; 18 USC § 3553

**Nature and Circumstances of the Offense:**

**1. Offense Conduct:** This section of the PSR is presented in paragraphs 12 through 62 and there are no objections. As to the Offense Conduct, Mr. Nobrega was the owner of Achabal Technologies, a Florida for-profit corporation, and Achabal Technología S.A., the Venezuelan branch of Achabal Technologies. Mr. Nobrega admitted that during the time of the offense, he and his companies serviced the Venezuelan military's fleet of Russian Sukhoi SU-30 combat aircraft by injecting a polyurethane explosion suppressant foam (ESF) into the fuel tanks to replace the old, disintegrated foam. This repair technique made it unnecessary to remove the aircraft wings and allowed for a cheaper and more expeditious repair on site. Mr. Nobrega also admitted he received payment from Petróleos De Venezuela, S.A., (PDVSA) through a company bank account set up in Portugal.

**2. Mr. Nobrega's Cooperation with the Government:** Consistent with Mr. Nobrega's acceptance of responsibility, his profound remorse for his involvement in this offense, and his guilty plea, , we believe he has offered meaningful assistance to the Government and, consistent

3

with paragraphs 9 through 11 of the written Plea Agreement, he is hopeful the Government will file a substantial assistance motion on his behalf.  Notwithstanding, we believe even without a Government sponsored motion, this Court may consider Mr. Nobrega's assistance to the Government in fashioning a Below-Guideline sentence in his case.  Post *Booker*, the Government conceded in *U.S. v. Fernandez*, 443 F. 3d 19, 33 (2nd Cir.  2006) and appellate courts have held, that the sentencing judge may consider a defendant's cooperation as one factor bearing on a proper sentence, even if the Government did not make a "departure" motion, *U.S. v. Barner*, 572 F. 3d 1239 (11th Cir.  2009).  Therefore, this Court, under 18 USC § 3553, may apply any weight to Mr. Nobrega's assistance in fashioning a Below-Guideline sentence in his case.

In support of a Below-Guideline sentence, this Court may also consider *United States v. Knox*, 573 F. 3d 441 (7th Cir.  2009) (we agree with *Davis* that, as a general matter, a district court may consider a defendant's cooperation with the government as a basis for a reduced sentence, even if the government has not made a  § 5K1.1 motion); *United States v. Fernandez*, 443 F. 19, 33 (2nd Cir.  2006) (reasoning that a district court should consider "the contention that a defendant made efforts to cooperate even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1"); *United States v. Doe*, 398 F. 3d 1254, 1260-61 (10th Cir.  2005) (concluding that "a defendant's assistance should be fully considered by the district court at sentencing even if that assistance is not presented to a court in the form of a § 5K1.1 motion"); *United States v, Murray*, 2005 WL 1200185 (S.D.N.Y. May 20, 2005 (unpub.) ("fact that defendant testified as witness for the government at time when he

4

had nothing to gain provides support for his genuine contrition"); *United States v. Hubbard*, 369 F. Supp. 2d 146, 150 (D. Mass. 2005) (suggesting court can correct for government's bad faith not making motion under 3553(a)(2)(C); and *United States v. Khoury,* 62 F. 3d 1138 (9th Cir. 1995) (court may depart downward where government refuses to make § 5K1.1 motion because defendant went to trial although government initially offered to do so and where defendant's cooperation led to arrest of co-defendant). In the case before this Court, Mr. Nobrega, through counsel, asks that his cooperation with the Government be fully recognized in considering a Below-Guideline sentence in his case. Counsel will elaborate further on Mr. Nobrega's assistance at sentencing.

**History and Characteristics of Defendant:**

**1. Personal and Family History**: Jorge Luis Nobrega Rodriguez is a 57 year old native of Venezuela and a naturalized U.S. citizen. He is the son of Luis Nobrega and Carmen Apolonia Nobrega, the brother of Irma Del Valle Nobrega and Rosa Maria Nobrega, and the father of Armando Luis, 28; Marcos Andres, 23; Leia Paulette, 15; and Georgia Monserrat, 11. Before his arrest and incarceration at the Federal Detention Center in Miami, Mr. Nobrega provided emotional and financial support for his mother and sister, all of his children, and the two mothers of his children.

Mr. Nobrega was born and raised in Cantaura, a small city with a current population of about 42,000 with modest income and housing. The city is located in the state of Anzoátegui, in the northeast section of Venezuela. He and his sisters were raised in a humble home with a

tin roof.  Although his father did construction work in the oil business and his mother was a school teacher, the family was poor during his formative years.  His parents were married for more than 50 years and they stayed together despite his father's relationships.  His father died on August 25, 2020, due to Covid.

He attended five years of military boarding school and graduated from high school in 1982. He then moved to Lawrence, Kansas, where he attended University of Kansas. He paid his way through college by working as a bartender for four years at the Hyatt Hotel in Kansas City. Despite his need to work, he was still able to focus on his education. He earned such high grades that he received a tuition grant from the Venezuelan government for his final year of college. He graduated from University of Kansas with a degree in mathematics and engineering in 1988.

In June 1998, Mr. Nobrega married Sherry Summers. For many years after graduation he continued to work as a bartender, first in Kansas City and later in Orlando, Florida, where he moved with his wife. Although they separated long ago, Ms. Summers continues to live in their marital home in Orlando with their two adult sons. Mr. Nobrega's mother, sisters, and his current girlfriend of more than 20 years, Durmelys Moy, with whom he shares his two young daughters, all continue to live in Venezuela. Mr. Nobrega has also maintained a Miami residence at 5077 NW 7th Street for more than ten years.

In 1992, Mr. Nobrega formed Achabal Technologies, Inc. and Achabal Technología, S.A. He had learned the oil business from his father.[1]  These companies operated fuel terminals

---

[1] The business of Mr. Nobrega's father failed during the Chávez regime.

6

and depots providing gasoline to personal vehicles and public transportation vehicles. The offense conduct in this case arises from the expansion of these businesses, wherein they agreed to service the fuel systems of aircrafts owned by the Venezuelan military. This offense conduct occurred from January 2019 to August 2021, after nearly thirty years of a very successful, lawful business operation.

On August 15, 2021, Mr. Nobrega was arrested at Miami international Airport in the presence of Durmelys Moy and their two young children. He has since been held without bond at the Federal Detention Center. He has accepted responsibility and he is cooperating with the Government. Sentencing is pending.

**2. Mr. Nobrega is a 57-Year-Old First-Time Offender with a History of Serious Health Problems:** Mr. Nobrega believes this Court should consider that, at 57 years of age and already facing many health problems, he presents a much lower risk of recidivism than most offenders. In *United States v. Lucania,* 379 F. Supp. 2d 288, 297 (E.D. N.Y. 2005), the district judge found that "Post-*Booker* courts have noted that recidivism is markedly lower for older defendants" and in *United States v. Nellum,* 2005 WL 300073 (N.D. Ind. Feb. 3, 2005)(unpub.), the court cited lower recidivism rates for older defendants and granted a downward departure. In this case, Mr. Nobrega asks this Court to consider both his age and health in fashioning a Below-Guideline sentence in his case.

The "Silver Tsunami" by Evan A. Jenness and published in the September/October 2013 Champion, discusses the issue of elderly and infirmed inmates. What is "old" when it comes to sentencing a defendant to prison is not the equivalent of "old" in the outside world. The

medium age of a federal defendant at sentencing is 34.[2] The National Institute of Corrections defines prisoners 50 and older as "elderly" and "aging",[3] and 15 states specifically define an "older" inmate as 50 or older.[4] Only 10.8 % of all federal defendants are over 50.[5]

Mr. Nobrega has suffered from chronic back pain for 25+ years and high blood pressure for 15+ years. He had bladder surgery 12+ years ago and hernia surgery in 2019. Both surgeries were done in Venezuela, and he continues to experience pain and discomfort from all of the above health problems. He has also been diagnosed with an unspecified heart deficiency and he has been taking medication to control his hypertension for years.

Mr. Nobrega was diagnosed with Covid in Venezuela in 2020. He was very ill for two months and required both intravenous fluids and oxygen during those months. He was also experiencing elevated liver enzymes which lead to a diagnosis of fatty liver disease, which has been attributed to his history of excessive drinking.

Pursuant to amendment 739 to § 5H1.4, a defendant's physical condition, individually or in combination with other offender characteristics, such as age and the length of any expected sentence, may be considered as sentencing factors in fashioning a Below-Guideline sentence in this case.

In an August 21, 2006 memorandum to all district court judges, the Administrative Office of the U.S. Courts indicated that the Bureau of Prisons will consider the presentence

---

[2] Sourcebook, Table 6
[3] Dr. Joann B. Morton, An Administrative Review of the Older Inmate, USDOJ, National Institute of Corrections, 4 (1992)
[4] Old Behind Bars, at 17
[5] Sourcebook, Table 6

investigation report, the statement of reasons and judicial placement recommendations in assigning a CARE level to an inmate.  There are four levels in the BOP CARE level system, which classifies inmates according to their healthcare needs.  At 57 years  of age  and with Mr. Nobrega's current health problems,  we believe he is already precluded from Level 1.  Level 2 is reserved for inmates who are stable out-patients, who can handle their own daily living activities, and their need  for acute medical services is less than three months in duration, occur no more than every two years, and can be resolved without hospitalization.  Level 3 is reserved for inmates who are fragile out-patients and Level 4 is for inmates with acute medical conditions.

At Mr.  Nobrega's   current age and health, any incarceration will, most likely, result in his immediate designation to Level 2.  His advancing age and increasing health conditions will eventually tax the resources and finances of the Bureau of Prisons, place an added risk to the inmate, and exacerbate his present conditions. Certainly, the medical evidence in this case is that every day Mr. Nobrega is further incarcerated will be far more challenging to him and the BOP compared to the vast majority of the inmate population.   Even when the sentencing guidelines were mandatory, downward departures under § 5H1.4 were permissible.  Again, Mr. Nobrega is asking this Court to impose a Below-Guideline sentence pursuant to the sentencing factors of 18 USC § 3553.

**3.  Mr. Nobrega Has Been Subjected to Vastly More Restrictive Conditions of Incarceration Than Normal:** Mr. Nobrega was arrested on August 15, 2021. This date was in the height of the Covid Omicron variant spread, which lead to a widespread return to early

Covid quarantine conditions. For the first 200 days of his incarceration, from August 15, 2021 until March 3, 2022, Mr. Nobrega was granted no more than 4 hours a day outside of his cell. More often than not he was isolated in his cell for 22 hours a day. There was even a 10-day period where they were on 24-hour lock down. This extreme confinement and isolation makes Mr. Nobrega's incarceration far more oppressive and deleterious than it has in history and probably beyond the intent of the justice system. The consequences of Covid on the detention experience truthfully cannot be overstated. Not only is there a high risk of infection, but an exceedingly high cost for personal protective equipment (PPE) and frequent testing (every 14 days) while he remains incarcerated. However, Mr. Nobrega would submit that the most critical consideration for this Court is the confinement conditions, and the effect that sitting in a six by nine foot cell for 22 hours a day has on a person's physical and mental health.

**4. Jorge Luis Nobrega Rodriguez' Family Ties and Responsibilities:**   Mr. Nobrega and his estranged wife, Sherry, have been separated 20+ years.  She still lives in the original marital home in Orlando, she is now 57-years-old, and both adult children continue live with her.  Armando, 28, is unemployed. He has been diagnosed with medical conditions that have historically precluded him from stable employment.[6] Marcos, 23, is a student at the University of Central Florida. Before his arrest, Mr. Nobrega was providing $4,000 a month in financial support to his family in Orlando.

Sherry Summers has written a letter to this Court with the following excerpt:

> My oldest son, Armando has had [many] crises in his life.  He has
> and continues to suffer from substance and alcohol abuse.  Jorge
> has supported him with long-term and short-term care throughout

---

[6] Armando is diagnosed with schizophrenia and has a history of drug abuse.

10

the years.  He is a positive encourager and continues to help him and myself deal with his behavior. Jorge has given his time, patience, and focus to helping Armando with his addiction, which intern helps me every day.  There are so many other instances and people which he has had a positive impact on, these are just a few in my life.

He has helped so many people over the years, his mother and our family friend were both diagnosed with cancer, and he supported them both through the years with his kind words and encouragement and cancer treatments.  Jorge has been such a great friend and provider to myself and both of my kids, even though our marriage never worked out. He has always been honest, truthful, and willing to help others any way he can.  When I need support, he has always been there for me no matter what.

Mr. Nobrega has been living with his current partner, Durmelys Josefina Moy Medina, for more than 20 years. They have two children together; Leia, 15, and Georgia, 11.  They live in Venezuela. Mr. Nobrega faced a parent's worst fear and a painful degree of accountability when he was unexpectedly arrested in the presence of his girlfriend and two minor daughters. The daughters were traumatized by witnessing their father's arrest and have required therapy to help them coping with the fallout.

The following is from a letter written to this Court by Maria de los Angeles Rondón, the Venezuelan neuropsychologist who is treating the children. The letter has been translated by Durmelys Moy. The first session with the children occurred on August 22, 2021, just 7 days after Mr. Nobrega's arrest and continues to this day.

Once in Venezuela, there has been an expected emotional breakdown in both girls, but mainly with Leia, who is much more aware of the situation that the family is going through and the possible implications that it may have on the future.  While it was therapeutically recommended that they return home, it was predictable that there would be an emotional setback, as it was

> initially necessary for the mother to remain in the United States.
> ....As the weeks went by, Leia developed a significant depressive
> episode that included suicidal ideation, and she had to be referred
> to a psychiatrist to be medicated.  Leia's father has always been
> emotionally close to his daughters and his prolonged absence, as
> well as the uncertainty of the date for the family reunion, ended
> up bringing Leia down.

The Court has received a letter, dated February 2, 2022, written by Durmelys Josefina
Moy Medina, Mr. Nobrega's girlfriend for 20+ years and the mother of his two youngest
children.  Durmelys' letter describes Mr. Nobrega's financial and emotional support of his
parents and even more significantly now that his mother has been widowed.  She is 85, she has
cancer, and she has been told Mr. Nobrega is stuck in the United States because of Covid.  She
does not know he is incarcerated and misses his daily phone calls.

Durmelys Moy's letter describes in detail Mr. Nobrega as a son, a father, a person, and
as a life partner.  Her letter shares Mr. Nobrega's true remorse.

> Jorge is a human with errors and virtues.  He is completely sorry
> from the heart.  The fact of being separated from his loved ones
> and from what he loves most has been devastating.  Seeing how
> he lost everything he fought and worked for has left him a great
> lesson.  He is very aware that he is close to turning 60, and the
> time he has left, he must take care of it like a treasure.  He tells
> me that the steps he will take and the decisions he will make in
> the future will always be correct and adhere to the Law and the
> right, as it always should have been.  He will not make any more
> mistakes.  He is aware that he has lost valuable time with his
> daughters, with me and his mom, time that can never be
> recovered.

Durmelys describes Mr. Nobrega's fatherhood as:

> [H]e is a devoted father and is always present for his children,
> taking care of every detail no matter how
> small."...........Undoubtedly, they miss their dad a lot.  The ages

of our daughters are 10 and 15 years old. For them, the absence of her father has affected them a lot.  My oldest daughter is currently undergoing psychological and psychiatric treatment to help her with the absence of her father."

For about the past 22 years, Mr. Nobrega has also supported his parents and his sister, Irma.  They have depended on him.  In the past, he even repaired his mother's home so she would be more comfortable.

The following is from a letter to this Court, as written, by Irma Nobrega, Mr. Nobrega's sister:

> Jorge is extremely dedicate to his family, his kids he is such a good father being always aware of what they needs not only material but emotionally, a good son to our parents taking care of them in wherever needs for health or living, like our mother medical expenses for a cancer chemotherapy.  Same with our dad who suffered respiratory condition.

The following is from a letter written to this Court by Max Perez, who has known Mr. Nobrega for over 40 years:

> He is a dedicated father and partner to his wife Durmelys.  He has always made sure their family was taken care of, including his children, parents, sisters, and extended family as well.  For many years, he has been the provider for many relatives less fortunate than him. He was always very welcoming and a great host at his house.  He is a very loyal person to those close to him and I could always count on him to help me when I needed support.

Effective October 27, 2003, the Sentencing Commission amended § 5H1.6 to limit the availability of departures for family ties and responsibilities.  The  new application note, § 5H1.6, comment. (n.1(A)(i)-(iii),  instructs the court to consider the seriousness of the offense, the defendant's involvement in that offense, and the members of the defendant's family.

Further, comment. (n.1(B)(i)-(iv) requires the court to consider if "the defendant's service of a sentence within the guideline range will cause a substantial loss of essential care-taking  or essential financial support to his family," that "the loss of care-taking or financial support exceeds the harm ordinarily incident to incarceration for a similarly situated defendant," that "the loss of care-taking or financial support is one in which no effective remedial or ameliorative programs reasonably are available," and that "the departure will effectively address the loss of care-taking or financial support." Notwithstanding this pre *Booker* amendment, Mr. Nobrega asks this Court to consider his family ties and responsibilities as an 18 USC § 3553(a)(1) sentencing factor in fashioning a Below-Guideline sentence in his case..

Courts have addressed the issue of incarcerating  the father of  young children and much has been written on the subject.

• "Children with fathers who have been incarcerated are significantly more likely than other children to be expelled or suspended from school (23 % compared with  4 %).  Pew Charitable Trusts Report "Collateral Costs: Incarceration's Effect on Economic Mobility" (2010) at page 5.  "Incarceration also creates economic aftershocks for these children and their families disrupted, destabilized, and deprived of a wage-earner, families with an incarcerated parent are likely to experience a decline in household income as well as an increased likely of poverty.  The struggle to maintain ties with a family member confined in an often-distant prison creates additional financial hardship for already fragile families left behind."  Id. At page 18.

• "Parental incarceration contributes to higher rates of delinquency, mental illness, and drug abuse, and reduces level of school success and later employment among their children."

14

Unlocking America, Why and How to Reduce America's Prison Population (JFA Institute, November 2007) at page 32.

Courts have responded.

• *U.S. v. Hammond*, 37 F. Supp. 2d 204 (E.D.N.Y.  1999), "a sentence without a downward departure would contribute to the needless suffering of young, innocent children."

• *U.S. v. DeRoover*, 36 F. Supp. 2d 531, 532-33 (E.D.N.Y.  1999), "the unique dependence of children on a defendant is a basis for a downward departure."

• *U.S. v. Chambers*, 885 F. Supp. 12, 14 (D.D.C.  1995), "causing needless suffering of young, innocent children does not promote the ends of justice."

• *U.S. v. Johnson*, 964 F. 2d 124, 128-130 (2d Cir.  1992), "we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing."

Mr. Nobrega has always maintained close relationships with his mother and sister Irma.[7] He is not close with his sister Rosa due to a strained relationship with her husband.  Mr. Nobrega maintains close relationships with his families in Orlando and Venezuela.  He has provided both emotional and financial support and both need him to return to work to help them meet their financial needs. As mentioned previously, Mr. Nobrega successfully ran a legitimate business for nearly 30 years before the offense conduct indicted in this case. He looks forward to his release and revival of that business venture for the welfare of his family. With that said, this Court is asked to consider Mr. Nobrega's family responsibilities in fashioning a Below-

---

[7] Mr. Nobrega's mother in Venezuela is unaware of his incarceration.  She would be devastated if she knew he was incarcerated in Miami.  She has been told he is stuck in the United States because of Covid.

15

Guideline sentence in this case. Counsel will have further remarks at sentencing.

     **5. Mr. Nobrega's Record of Charitable Works and Good Deeds**: In *U.S. v. Cooper*, 394 F. 3d 172 (3rd Cir.  2005), a securities and tax evasion case with a sentencing range of 15 to 21 months, a **four-level downward departure** for **good works** and a **sentence of probation was warranted** for a defendant's "exceptional" good works who **did not simply donate money to charity** but also organized and ran youth football team in depressed area, mentored  its members, and helped several members attend better high schools or go to college, which qualified as exceptional because they entail "**hands on personal sacrifices which have a dramatic and positive impact on the lives of others."**  In *U.S. v. Serafini*, 233 F. 3d 758 (3rd Cir.  2000), the community service and charitable works performed by the defendant, a state legislator convicted of perjury in a federal grand jury investigation, were sufficiently "extraordinary and exceptional" to justify a three-level downward departure for community and charitable activities; e.g., providing a $300,000 guarantee for medical treatment of a terminally ill patient and mentoring a seriously injured college student, and generosity of time and money; In *U.S. v. Woods*, 159 F. 3d 1132 (8th Cir.  1998), the defendant's exceptional charitable efforts bringing two troubled young women into her home, paying for them to attend private school and also assisting an elderly friend to move from a nursing home to an apartment justified a one-level departure; *In U.S. v. Jones*, 158 F. 3d 492 (10th Cir.  1998), a defendant pled guilty to possession of a firearm by a prohibited person and the district court did not abuse its discretion when it departed downward three-levels when, as one of several factors, it considered the defendant's long history of community service; In *U.S. v. Crouse*, 145 F. 3d 786 (6th Cir.  1998),

the defendant was a chief executive officer of a company found to have distributed orange juice adulterated with sugar, and where the judge departed downward 13-levels, from 30 to 37 months, to impose home confinement, the appeals court deferred to the district court's decision that the departure was justified, but the extent of it was excessive; In *U.S. v. Rioux*, 97 F. 3d 648, 663 (2nd Cir. 1996), affirming downward departure on charitable fund-raising conduct as well as poor medical condition; *U.S. v. Canoy*, 38 F. 3d 893 (7th Cir. 1994), charitable and civic activities may, if exceptional, provide a basis for departure. Finally, in the district court, *U.S. v. Greene*, 249 F. Supp. 2d 262 (SDNY 2003), in a tax case, the defendant was granted a 7-level departure because of extraordinary charitable good works–devoting his life to orphaned children, while just a salaried employee, and extraordinary family circumstances and; *U.S. v. Bennett*, 9 F. Supp. 2d 513 (EDPA 1998), in the largest charitable fraud case in history, under § 5H1.11, the defendant's civic and charitable good deeds were extraordinary and, together with other grounds, a departure from 232 months to 92 months was warranted. *Id*; see also *United States v. Tomko*, 562 F. 3d 558, 572 (3rd Cir. 2009)(en banc) (upholding probation sentence with home confinement in tax fraud case and commenting on support from letters written on defendant's behalf, demonstrating his community ties and extensive charitable works); *United States v. Thurston*, 544 F. 3d 22 (1st Cir. 2008)(affirming three-month sentence for $5 million medicare fraud and commenting on district court's findings related to defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others."); *United States v. Howe*, 543 F. 3d 128 (3rd Cir. 2008)(upholding probation sentence with home confinement for government fraud case based on district court's finding that defendant was well

regarded in his community, was a devoted husband, father and son and had a significant degree of remorse at sentencing); *United States v. Wachowiak*, 496 F. 3d 744 (7th Cir. 2007)(affirming 70-month sentence with 121-to-151-month advisory guidelines in child pornography case and commenting on district court's recognition of defendant's sincere expression of remorse and broad support of his family, friends, colleagues, as not being reflected in Category I criminal history under the guidelines); *United States v. Canova*, 412 F. 3d 331, 358 (2nd Cir. 2005)(affirming probation sentence in medicare fraud prosecution and upholding district court's departure based on "exceptional degree" of defendant's public service and good works).

Judge Jed Rakoff, of the Southern District of New York, in *United States v. Adelson*, 441 F. Supp 506,511 (SDNY 2006), explained the importance of a defendant's good works and the support of his community that he receives at sentencing and stated the following:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. The elementary principle of weighing the good with the bad, which is basic to all great religions, moral philosophies, and systems of justice, was plainly part of Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant.

The following is an excerpt from a letter written by Durmelys Josefina Moy Medina, Mr. Nobrega's girlfriend for 20+ years and the mother of his two youngest children:

> He is always there for his friends, family, or a known person who needs him. During the pandemic, his immediate actions managed to save the lives of friends, no matter where they were, he was looking for ways to help them with cylinders of oxygen, medicines, nurses; without these actions and measures, undoubtedly, those lives would have been lost. Jorge has a noble

> heart and is responsibly detached from material things.  Where
> we live, there is a place called "La Aldea De Los Pescadores" it
> is a sector with little purchasing power; he anonymously
> contributes for food. He also provided the Maria Auxiliadora
> Church with three central air-conditioning units; on the other
> hand, he provided a school with a library and an air-conditioned
> Café, where children have breakfast and lunch.....

The following is from a letter written to this Court by Hector Arturo Borgos Lugo, who

has known Mr. Nobrega for 45+ years.

> I remember when we studied together in high school, I often
> couldn't go home on weekends because it was so far from school.
> Jorge on his initiative and with the approval of his parents,
> allowed me to stay in his house, remodeling the home to
> accommodate me there and thus be able to stay with them on
> weekends.  For me, that was special and, they made me feel like
> part of their family, letting me know from a very young age the
> kindness and exceptional personality of Jorge.  That's how
> generous he has been since I've known hm...Jorge is one of those
> people who would prefer to go without eating to offer his plate of
> food to someone else...

The following is from a letter written by Fernando Enrique Laurency Pondal, a

Venezuelan engineer who currently works with Mr. Nobrega as an engineer for Achabal

Technology, Inc.

> On this occasion, I am writing to you to request your indulgence
> in the case of Jorge Luis Nobrega because he is a concerned father
> for his four children Armando, Marco, Leia and Georgia.  Besides
> being my friend, he is like a brother, he has always been willing
> to listen to my problems and concerns.  Jorge is intelligent, with
> ingenious solutions to solve work problems easily.
>
> Jorge was there for me and my children when I was getting
> divorced. Jorge got the full treatment for the daughter of a
> colleague, who was attacked by assailants. Jorge paid out of his
> pocket, all the painting, to paint the entire high school from which
> we had graduated. Where Jorge lives, he is known for his great

collaboration with everything related to the maintenance of the facilities and is highly esteemed for this.

A letter written by Lauranny Bermudez, dated February 2, 2022, provides more information regarding the child referenced in the above letter.

> Jorge saved the life of a boy who suffered from a disease that could end his life.  This child needed an expensive operation to be saved, this was a fairly long process, from many medical studies and medications to the operation, and throughout the journey, he was present supporting the family, without any interest involved, because this was the son of one of his employees, with this, I am not only referring to financial support but also the emotional part, the human part that denotes the greatness of men.

From a letter written to this Court by Hector Arturo Borges Lugo:

> Jorge has consistently been a crucial member of the community in Venezuela.  Member of foundations whose funds go to the maintenance of dispossessed families and very low-income children.  Achieving the recovery of schools and sports parks which benefit the community in which Jorge was born.  In the same way, Jorge has proven to be an exemplary father, an unconditional brother, and an exceptional son.

 Mr. Nobrega is exemplary in his charitable contributions, protection of the underprivileged, and service to his community. He champions for the betterment of people he does not even know, acts with no self-serving motives, and accepts no accolades for these good deeds. His character is truly exceptional and may be considered by this Court in fashioning a Below-Guideline sentence in this case.

   **6.  Jorge Luis Nobrega Rodriguez' Request for RDAP:** Mr. Nobrega began using alcohol in his youth.  He began to drink excessively in college.   He began his business at a young age and the stress of business, business travel, and business meetings and lunches, all

contributed to heavy drinking; many drinks of hard liquor, namely scotch, daily. For years, Mr. Nobrega frequently drank himself to sleep and this continued until his arrest. Before the arrest, Mr. Nobrega's blood tested positive for elevated liver enzymes attributed to alcohol abuse.

Mr. Nobrega has struggled with back pain for decades and would buy pain pills on the street in Venezuela. He has also used Klonopin and Xanax to help with stress and insomnia.

If Mr. Nobrega is further incarcerated, through counsel, he will ask this Court to recommend to the BOP he be considered for its RDAP program. Mr. Nobrega understands this is only a recommendation and not a guarantee he will be accepted into the program.

<u>**CONCLUSION**</u>

Defendant**,** Jorge Luis Nobrega Rodriguez humbly accepts responsibility for his criminal conduct and for the collateral consequences that have been suffered by his family and his community. He thanks this Court for considering this Response to the PSR and Request For a Below-Guideline Sentence and RDAP. He hopes this Court will consider his sincere remorse, his philanthropy, his strong familial deterrence from recidivism, and the grave impact of Covid-era incarceration, in reaching a just sentence.

Based upon the facts and factors set forth above, Jorge Luis Nobrega Rodriguez, through counsel, respectfully requests this Court: (1) impose a Below Guideline sentence of 18 months, and (2) recommend that the BOP consider him for its RDAP program and designate him as close to his family in Florida as is possible.

DATED this 12th of May 2022.          Respectfully Submitted,

/s/ David W. Macey
David Macey, Esq.
Florida Bar No.: 185612
San Lorenzo Avenue, PH-830
CoralGables, FL 33146
Telephone: (305) 860-2562
Fax: (305) 675-5841
Email:dm@davidmacey.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 12th, 2022 a true and correct copy of the foregoing

was filed via the Court's electronic filing system through which all counsel of record will

receive a copy thereof.

/s/ David W. Macey
David. W. Macey, Esq.
Florida Bar No.: 185612